Sophia Rios (SBN 305801)
**BERGER MONTAGUE PC**
8241 La Mesa Blvd, Suite A
La Mesa, CA 91942
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net


*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **David Zarate, on behalf of his minor child, A.Z, individually and as a representative of the class,**<br><br>**Plaintiff,**<br><br>v.<br><br>**PowerSchool Holdings, Inc., PowerSchool Group LLC,**<br><br>**Defendants.** | Case No. **'25CV0985 BEN MSB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**Violations of**<br>　(1) **Negligence;**<br>　(2) **Negligence Per Se;**<br>　(3) **Breach of Implied Contract;**<br>　(4) **Unjust Enrichment;**<br>　(5) **Declaratory Judgment;**<br>　(6) **California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200,** *et seq.***;**<br>　(7) **California Confidentiality of Medical Information Act, Civ. Code § 56;**<br>　(8) **California Privacy Rights Act, Civ. Code § 1798.100; and**<br>　(9) **California Constitutional Right to Privacy, Cal. Const., Art. I, § 1.**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW, Plaintiff David Zarate, on behalf of his minor child, A.Z., through his undersigned counsel, brings this class action complaint against Defendant PowerSchool Holdings, Inc. and Defendant PowerSchool Group LLC ("PowerSchool" or "Defendants") and alleges as follows:

## I.    SUMMARY OF THE ACTION

1.    PowerSchool is one of the leading providers of cloud-based K-12 education software in North America.[1] PowerSchool provides software to over 18,000 schools to support approximately 60 million students, primarily K-12, throughout North America.[2]

2.    As part of PowerSchool's Student Information System ("SIS") product, PowerSchool collects personally identifying information ("PII") and/or protected health information ("PHI") from students, their guardians, and school employees.[3] In order to use PowerSchool's services, customers must provide PowerSchool with students' and employees' PII and/or PHI.

3.    PowerSchool's website is replete with pages professing its commitment and duty to securing this PII and PHI, representing that it will "keep [] students' data secure and accessible" while "protecting it with a dedicated security team and hosting it on a world-class platform."[4] PowerSchool further touts

---

[1] *PowerSchool*, https://www.powerschool.com/ (last accessed Apr. 10, 2025).

[2] Carly Page, *What PowerSchool Won't Say About Its Data Breach Affecting Millions of Students*, TechCrunch (Mar. 10, 2025), https://techcrunch.com/2025/03/10/hacker-accessed-powerschools-network-months-before-massive-december-breach/.

[3] *Student Information Solutions*, https://www.powerschool.com/student-information-cloud/ (last accessed Apr. 10, 2025).

[4] *PowerSchool, Student Information Solutions*, https://www.powerschool.com/student-information-cloud/ (last accessed Apr. 11, 2025).

its cybersecurity policies, "assuring stakeholders that your student data is safe," and expressly stating that its "compliance initiatives are driven by many regulations."[5]

4.      Nevertheless, even though PowerSchool collects, stores, and maintains this PII and/or PHI from over 60 million people—including minors—PowerSchool's cybersecurity systems failed to protect it. Between December 19, 2024, and December 28, 2024, threat actors hacked into PowerSchool's systems, exfiltrating the highly sensitive and valuable PII and/or PHI from the SIS through PowerSource, one of PowerSchool's community-focused support portals (the "Data Breach"). On December 28, 2024, PowerSchool learned of the Data Breach, and starting on or around January 8, 2025, PowerSchool started to notify its customers that hackers had accessed their stakeholders PII and/or PHI.

5.      Now, Plaintiff's and Class Members' PII and/or PHI, which includes, at a minimum, names, contact information, dates of birth, limited medical information, Social Security Numbers, and other related information—has been exposed in this attack. Plaintiff and Class Members, which involve a number of minor children, are now at risk for fraud, identity theft, and other harm and misuse for the unforeseeable future, which may last throughout their lifetimes.

6.      Plaintiff, on behalf of his minor child and the Class, brings claims for negligence, negligence per se, breach of implied contract, unjust enrichment, declaratory judgment, and California statutory claims, including violations of the Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq*, California Confidentiality of Medical Information Act, Civ. Code § 56 *et seq*, and California Privacy Rights Act, Civ. Code § 1798.100 *et seq*.

---

[5] *CyberSecurity, Data Privacy, & Infrastructure*, https://www.powerschool.com/security/ (last accessed Apr. 11, 2025).

## II.   <u>PARTIES</u>

7.    Plaintiff David Zarate brings this suit on behalf of his child, A.Z., a minor, and at all relevant times, is and was a citizen of California. A.Z. is, and was at all relevant times, an individual and citizen of Richmond, California.

8.    Defendant PowerSchool Holdings, Inc., is a Delaware corporation and maintains its principal place of business at 150 Parkshore Dr., Folsom, California, 95630.

9.    Defendant PowerSchool Group LLC is a Delaware limited liability company and maintains its principal place of business at 150 Parkshore Dr., Folsom, California 95630.

## III.   <u>JURISDICTION AND VENUE</u>

10.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interests and costs. There are more than 100 putative Class Members, and at least some members of the proposed Class have a different citizenship from Defendants. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy.

11.    This Court may exercise jurisdiction over Defendants because they maintain their principal place of business in California, are registered to conduct business in California, have sufficient minimum contacts in California, and/or intentionally avail themselves of the markets within California through the promotion, sale, and marketing of their services, thus rendering the exercise of jurisdiction by this Court proper and necessary.

12.    Venue is proper in this District under 28 U.S.C. § 1391 because the Judicial Panel on Multidistrict Litigation on April 7, 2025, issued an order centralizing litigation arising out of the PowerSchool Data Breach in this District.

## IV.    FACTUAL BACKGROUND

### A.    PowerSchool's Cloud-Based Products Collect PII and/or PHI.

13.    PowerSchool is "a leading provider of cloud-based K-12 education software in North America."[6] It provides "software to more than 18,000 schools to support some 60 million students across North America."[7]

14.    As part of PowerSchool's Student Information System ("SIS") product, PowerSchool collects data related to student data management and enrollment systems to "[e]stablish a single source" for all student records.[8]

15.    K-12 schools use the SIS to, among other things, "manage student records, grades, attendance, and enrollment." [9] The SIS software collects information including information like student names, schools, birthdays, addresses, parent or guardians, Social Security numbers, health concerns, and disciplinary records.[10] The SIS also collects other sensitive student data, including information about parental access rights to [] children, restraining orders, and

---

[6] *PowerSchool*, https://www.powerschool.com/ (last accessed Apr. 10, 2025).

[7] Carly Page, *What PowerSchool Won't Say About Its Data Breach Affecting Millions of Students*, TechCrunch (Mar. 10, 2025), https://techcrunch.com/2025/03/10/hacker-accessed-powerschools-network-months-before-massive-december-breach/.

[8] *Student Information Solutions*, https://www.powerschool.com/student-information-cloud/ (last accessed Apr. 10, 2025).

[9] Carly Page, *What PowerSchool Won't Say About Its Data Breach Affecting Millions of Students*, TechCrunch (Mar. 10, 2025), https://techcrunch.com/2025/03/10/hacker-accessed-powerschools-network-months-before-massive-december-breach/.

[10] Kevin Collier, *Children's Data Hacked After School Software Firm Missed Basic Security Step, Internal Report Says*, NBC News (Jan. 31, 2025), https://www.nbcnews.com/tech/security/powerschool-hack-data-breach-protect-student-school-teacher-safe-rcna189029.

student medical information,"[11] as well as information regarding student disabilities and what supports are put into place for special education students.[12]

16.    As part of its cloud-based SIS, customers' students and educators entrusted PowerSchool with their PII and/or PHI.

17.    Plaintiff and Class Members had a reasonable expectation that PowerSchool would protect its PII and/or PHI. Indeed, PowerSchool stated, "We are dedicated to protecting your students' data with a comprehensive security program that starts with 'secure by design' principles at the inception of our products and extends through third-party penetration testing, robust cloud security, and a fully staffed 24x7x365 Security Operations Center."[13]

**B.    PowerSchool knew it had duties to protect Plaintiff's and Class Members' PII and/or PHI, and it Promised them that it would.**

18.    PowerSchool's website, which has multiple webpages dedicated to security and privacy, claims that it has robust systems and processes in place to protect and secure the highly sensitive PII and/or PHI that it solicits, collects, stores, and maintains.

---

[11] Carly Page, *What PowerSchool Won't Say About Its Data Breach Affecting Millions of Students*, TechCrunch (Mar. 10, 2025), https://techcrunch.com/2025/03/10/hacker-accessed-powerschools-network-months-before-massive-december-breach/.

[12] Kevin Collier, *Children's Data Hacked After School Software Firm Missed Basic Security Step, Internal Report Says*, NBC News (Jan. 31, 2025), https://www.nbcnews.com/tech/security/powerschool-hack-data-breach-protect-student-school-teacher-safe-rcna189029.

[13] *Student Information Solutions, How PowerSchool Protects Data*, https://www.powerschool.com/student-information-cloud/ (last accessed Apr. 10, 2025).

19.    In its Privacy Policy, PowerSchool proclaims to "place[] great importance and value on the proper handling of personal data that flows within our product as we provide services to our customers."[14]

20.    PowerSchool further professes to:

> [P]rotect our customers' personal data from unauthorized access, use, modification, disclosure, loss, or theft by leveraging various reasonable security measures and methods to secure our customers' personal data throughout its processing lifecycle with PowerSchool applications. Our overall aim is to ensure the confidentiality, integrity, and availability of our customers' personal data by leveraging technical, organizational, and where appropriate, physical security methods. Security protection at PowerSchool is a cross-functional activity that intersects our workforce duties, and we have relevant security and privacy policies to drive expectations from the workforce.[15]

21.    PowerSchool highlights its emphasis on securing student data on the first page of its security website:[16]

## Cybersecurity, Data Privacy, & Infrastructure

PowerSchool is committed to being a good custodian of student data, taking all reasonable and appropriate countermeasures to ensure data confidentiality, integrity, and availability.

22.    PowerSchool contends that "privacy considerations are embedded into the design, and this is reflected in our final products pushed to our customers," and

---

[14] *PowerSchool's Privacy Principles*, https://www.powerschool.com/privacy/ (last accessed Apr. 10, 2025).
[15]    *PowerSchool's Privacy Principles, Security*, https://www.powerschool.com/privacy/ (last accessed Apr. 10, 2025).
[16]    *Cybersecurity, Data Privacy & Infrastructure*, https://www.powerschool.com/security/ (last accessed Apr. 10, 2025).

that it "build[s] privacy as the default setting in our products, ensure end-to-end security, and exemplify respect for user privacy in all our products."[17]

23.    PowerSchool also asserts that it "use[s] state-of-the-art, and appropriate physical, technical, and administrative security measures to protect the personal data that we process."[18]

24.    In PowerSchool's Global Privacy Statement, it asserts that:

> Whether PowerSchool is a collector or processor or your data, PowerSchool is committed to protecting your personal information. PowerSchool uses commercially reasonable physical, administrative, and technical safeguards to preserve the confidentiality, integrity, and availability of your personal information. Our systems are regularly certified by third parties against industry security standards from AIPCA and ISO. As customers provide PowerSchool with Customer Data to process, PowerSchool makes commercially reasonable efforts to ensure the security of our systems. Please note that this is not a guarantee that such information may not be accessed, disclosed, altered, or destroyed by breach of any of our physical, administrative, and technical safeguards.
>
>                                         . . . .
>
> PowerSchool employs a variety of physical, administrative, and technological safeguards designed to protect your data against loss, misuse, and unauthorized access or disclosure. We strive to continuously maintain reasonable physical, administrative, and technical security measures. Our security measures consider the type and sensitivity of the data being collected, used, and stored, and the current state of technology and threats to data. PowerSchool independently verifies its security management system to the internationally recognized standard for security management and holds ISO 27001 and SOC2 certifications. PowerSchool also

---

[17] *PowerSchool's Privacy Principles, Privacy by Design*, http://powerschool.com/privacy/ (last accessed Apr. 10, 2025).
[18] *PowerSchool's Privacy Principles, Frequently Asked Questions*, https://www.powerschool.com/privacy/ (last accessed Apr. 10, 2025).

1   endeavors to align its privacy and security operations to best practices
2   and relevant international regulations.[19]

3       25.    PowerSchool even acknowledges the prevalence of school
4   cybersecurity attacks in recent years, explaining that "[c]ybercriminals tend to take
5   advantage of any vulnerability that presents itself," and identifies three data
6   breaches in 2023 alone.[20]

7       **C.    The Data Breach exposed highly sensitive PII and/or PHI.**

8       26.    On or about December 19, 2024, a threat actor gained access to PII
9   and/or PHI in PowerSource, a "community-focused customer portal."[21] The hackers
10  entered the system by "obtain[ing] a single employee's password," which granted
11  them access to a "function that let them download millions of children's personal
12  information."[22]

13      27.    PowerSchool has admitted that the hackers were able to access and
14  download the student records by logging into an account that failed to have two-
15  factor authentication enabled.[23]

---

[19] *Global Privacy Statement*, https://www.powerschool.com/privacy/ (last updated Oct. 1, 2024).

[20] *PowerSchool: A Leader in Responsible AI for Education*, https://go.powerschool.com/rs/861-RMI-846/images/Responsible_AI_Cybersecurity_Report.pdf?version=0 (June 10, 2024).

[21] *PowerSchool CyberSecurity Incident, Summary Update*, https://www.powerschool.com/security/sis-incident/ (last updated Mar. 7, 2025).

[22] Kevin Collier, *Children's Data Hacked After School Software Firm Missed Basic Security Step, Internal Report Says*, NBC News (Jan. 31, 2025), https://www.nbcnews.com/tech/security/powerschool-hack-data-breach-protect-student-school-teacher-safe-rcna189029.

[23] Lawrence Abrams, *PowerSchool Hack Exposes Student, Teacher Data from K-12 Districts*, Bleeping Computer (Jan. 7, 2025), https://www.bleepingcomputer.com/news/security/powerschool-hack-exposes-student-teacher-data-from-k-12-districts/#:~:text=Social%20Security%20numbers%20(SSNs).

28.     On December 22, 2024, the attackers used automated scripts to exfiltrate data from the Students and Teachers database table from PowerSource using a data export tool used for remote support. These files were then written to two CSV files: students_export.csv and teachers_export.csv.[24]

29.     Even though the hacker used the compromised credentials on December 19, 2024, PowerSource only learned that it was the victim of the hack on December 28, 2024, when the hacker contacted the company to inform it and ask for a payment.[25]

30.     Eventually, PowerSchool investigated the hack and determined that the types of information involved included one or more of the following: "name, contact information, date of birth, Social Security Number, limited medical information, and other related information."[26]

31.     Finally, on January 7, 2025, PowerSchool announced the Data Breach and started to notify customers.[27]

### D.     Defendants knew that criminals target PII and PHI.

32.     At all relevant times, Defendants knew, or should have known, that the PII and PHI of individuals whose information was exfiltrated—including Plaintiff and all Class Members, were targets for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data

---

[24] Andy Lombardo, *The PowerSchool Data Breach: What We Know Today, How to Check Your Exposure, and How to See What Fields Were Exfiltrated*, EdTech IRL, https://www.edtechirl.com/p/the-powerschool-data-breach-what (Jan. 9, 2025).

[25] Kevin Collier, *Children's Data Hacked After School Software Firm Missed Basic Security Step, Internal Report Says*, NBC News (Jan. 31, 2025).

[26] *PowerSchool Cybersecurity Incident, Summary Update*, https://www.powerschool.com/security/sis-incident/ (last updated Mar. 7, 2025).

[27] *PowerSchool Cybersecurity Incident, Summary Update*, https://www.powerschool.com/security/sis-incident/ (Jan. 13, 2025 Update).

privacy and security measures to protect Plaintiff's and Class Members' information from cyberattacks that Defendants should have anticipated and guarded against.

33.    Cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2021 report, the healthcare compliance company Protenus found that there were 758 medical data breaches in 2020 with over 40 million patient records exposed.[28] This is an increase from the 572 medical data breaches that Protenus compiled in 2019.[29]

34.    PII and PHI are valuable property rights.[30] The value of this information as a commodity is measurable.[31] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory

---

[28] Protenus, *2021 Breach Barometer*, PROTENUS.COM,
https://www.protenus.com/resources/2021-breach-barometer (last accessed Nov. 15, 2021).
[29] Protenus, *2020 Breach Barometer*, PROTENUS.COM,
https://www.protenus.com/resources/2020-breach-barometer (last accessed Nov. 15, 2021).
[30] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for
Information Processing 26 (May 2015) ("The value of [personal] information is well understood
by marketers who try to collect as much data about personal conducts and preferences as
possible."),
https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.
[31] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black
Market*, MEDSCAPE.COM    (April    28,    2014),
http://www.medscape.com/viewarticle/824192.

frameworks."[32] American companies are estimated to have spent over $19 billion on acquiring the person data of consumers in 2018.[33] Personal data is so valuable to identity thieves that once PII or PHI has been disclosed, criminals often trade it on the "cyber black-market" or the "dark web" for many years.

35.    As a result of the real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, PII, PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

36.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[34] A cyber-criminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[35] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft

---

[32] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://one.oecd.org/document/DSTI/ICCP/IE/REG(2011)2/FINAL/en/pdf.

[33] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[34] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data* Article") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "[h]ealth information is a treasure trove for criminals.").

[35] *Id.*

1  were forced to pay out-of-pocket costs for healthcare they did not receive in order
2  to restore coverage.[36]

3  37.    All-inclusive health insurance dossiers containing sensitive health
4  insurance information, names, addresses, telephone numbers, email addresses,
5  SSNs, and bank account information, complete with account and routing numbers,
6  can fetch up to $1,200 to $1,300 each on the black market.[37] According to a report
7  released by the FBI's Cyber Division, criminals can sell healthcare records for 50
8  times the price of a stolen Social Security or credit card number.[38]

9  38.    Criminals can use stolen PII and PHI to extort a financial payment by
10  "leveraging details specific to a disease or terminal illness."[39] Quoting Carbon
11  Black's Chief Cybersecurity Officer, one recent article explained: "Traditional
12  criminals understand the power of coercion and extortion . . . By having healthcare
13  information—specifically, regarding a sexually transmitted disease or terminal
14  illness—that information can be used to extort or coerce someone to do what you
15  want them to do."[40]

16  39.    Consumers place a high value on the privacy of that data. Researchers
17  shed light on how much consumers value their data privacy—and the amount is

[36] *See* Elinor Mills, *Study: Medical Identity Theft Is Costly for Victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.
[37] SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAGAZINE (July 16, 2013), https://www.scworld.com/news/health-insurance-credentials-fetch-high-prices-in-the-online-black-market .
[38] Federal Bureau of Investigation, National Security Archive, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://nsarchive.gwu.edu/media/18867/ocr.
[39] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[40] *Id.*

considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[41]

40.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of that consumer's PII or PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

**E.    Theft of PII and PHI has grave and lasting consequences for victims, including minors.**

41.    Theft of PII and PHI is serious. The FTC warns consumers that identity thieves use PII and PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[42]

42.    Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[43] According to Experian, identify thieves and fraudsters "can use your personal information to take over your accounts, use your accounts, open new accounts, file

---

[41] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Information Systems Research 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[42] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Apr. 11, 2025).

[43] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

tax returns or even get medical procedures in your name," as well as sell data on the Dark Web, fraudulently transfer home titles and take out mortgages against the victims' homes.[44]

43.    With access to an individual's PII or PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[45]

44.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[46]

45.    Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a

---

[44] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Info and How Can You Protect Yourself*, Experian (Apr. 8, 2025), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[45] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IdentityTheft.gov, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last access Apr. 11, 2025).

[46] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT Resource Center (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/05/2021-ITRC-Consumer-Aftermath-Responses-Non-Pandemic-Related.pdf (last accessed Apr. 11, 2025).

1    new SSN will not be provided until after the harm has already been suffered by the

2    victim.

3    46.    Due to the highly sensitive nature of SSNs, theft of SSNs in

4    combination with other PII (e.g., name, address, date of birth) is akin to having a

5    master key to the gates of fraudulent activity. TIME quotes data security researcher

6    Tom Stickley, who is employed by companies to find flaws in their computer

7    systems, as stating, "If I have your name and your Social Security number and you

8    don't have a credit freeze yet, you're easy pickings."[47]

9    47.    Theft of PII is even more serious when it includes theft of PHI. Data

10    breaches involving medical information "typically leave[] a trail of falsified

11    information in medical records that can plague victims' medical and financial lives

12    for years."[48] It "is also more difficult to detect, taking almost twice as long as normal

13    identity theft."[49] In warning consumers on the dangers of medical identity theft, the

14    FTC states that an identity thief may use PII and PHI "to see a doctor, get

15    prescription drugs, buy medical devices, submit claims with your insurance

16    provider, or get other medical care."[50] The FTC also warns, "If the thief's health

17

18

19    [47] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink*

20    *How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019),
      https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

21    [48] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, World

22    Privacy Forum (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-
      content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

23    [49] *See* Federal Bureau of Investigation, National Security Archive, *Health Care*

24    *Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial*
      *Gain* (April 8, 2014), https://nsarchive.gwu.edu/media/18867/ocr.

25    [50] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL

26    TRADE COMMISSION CONSUMER INFORMATION,
      https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last

27    accessed Apr. 11, 2025).

28

information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[51]

48.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.
- Significant bills for medical goods and services not sought or received.
- Issues with insurance, co-pays, and insurance caps.
- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.
- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.
- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgages or other loans and may experience other financial impacts.
- Phantom medical debt collection based on medical billing or other identity information.
- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[52]

49.     Children are especially vulnerable to data breaches because the effects may not show up for years. Specifically,

> "One of the greatest challenges that we see with minors having their identities compromised is that there is no notification," said Tracy Kitten, director of fraud and security at Javelin Strategy and Research. "So it's not until you go to apply for a

---

[51] *Id.*

[52] *See* Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, *supra* at 48.

student loan when the child is going to college, or maybe when a child applies for a first job — we're talking about the age of 15 or 16 — that you realize, hey there's something going on with the credit."[53]

### F. PowerSchool had a duty to safeguard PII and PHI under the Federal Trade Commission Act and the Children's Online Privacy Protection Act.

50.    PowerSchool owed Plaintiff and Class Members a duty to protect and safeguard PII and PHI under the Federal Trade Commission Act ("FTC Act") and the Children's Online Privacy Protection Act ("COPPA") to securely maintain all information.

51.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Additionally, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

52.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security

---

[53] Alina Machado, *How to Protect Your Child's Credit Following a Data Breach*, NBC Boston (Aug. 4, 2023), https://www.nbcboston.com/investigations/consumer/how-to-protect-your-childs-credit-following-a-data-breach/3106227/ (last accessed Apr. 11, 2025).

problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

53.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

54.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

55.    As evidenced by the Data Breach, PowerSchool failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of their data security practices. PowerSchool's failure to employ reasonable and appropriate measures to protect against unauthorized access to PowerSchool constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

56.    PowerSchool also failed to comply with the COPPA, 15 U.S.C. §312.10. Under COPPA, PowerSchool is "mandate[d]" to only "retain children's personal information for as long as is reasonably necessary to fulfill the purpose for which the information was collected," and then had a duty to "delete [the child's

PII and PHI] using reasonable measures to ensure it's been securely destroyed," even if a parent or guardian does not request PowerSchool to delete the information.

57.    PowerSchool was at all times fully aware of its obligation to protect the PII and PHI yet it failed to comply with such obligations. PowerSchool was also aware of the significant repercussions that would result from its failure to do so.

**G.    Plaintiff and Class Members sustained damages.**

58.    Plaintiff and all other Class Members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—a risk that justifies expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; (v) lost value of the unauthorized access to their PII and PHI permitted by Defendants; (vi) the value of long-term credit monitoring and identity theft protection products necessitated by the Data Breach; and/or (vii) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

**H.    Plaintiff's minor child's PHI and PII were involved in the Data Breach.**

59.    Plaintiff's child A.Z. was a student at West Contra Costa Unified School District. In order to enroll A.Z. at the school, Plaintiff Zarate provided the school with his child's PII and/or PHI.

60.    On January 10, 2025, Plaintiff Zarate received an email from the West Contra Costa Unified School District, stating that "a cybersecurity breach [] has affected PowerSchool, the company that provides our student information system. PowerSchool recently discovered unauthorized access to its system and is working

to address the situation." It further stated that "[t]he data that may have been compromised includes family and educator information."

61.    On February 24, 2025, Plaintiff Zarate received an email from PowerSchool, stating that his minor child's PII that was directly or indirectly entrusted to PowerSchool was compromised in the Data Breach.

62.    At the time that PowerSchool discovered the Data Breach—on or around December 28, 2024—PowerSchool retained Plaintiff A.Z.'s PII and/or PHI in its computer systems.

63.    According to the letter, PowerSchool learned of the Data Breach as early as December 28, 2024, but it waited approximately two months before it notified Plaintiff Zarate that his minor child's highly sensitive PII and/or PHI was compromised in the Data Breach.

64.    In addition to its substantial delay in notifying Plaintiff Zarate of the Data Breach, PowerSchool also put the burden on Plaintiff Zarate to prevent any further harm resulting from the Data Breach by stating in the letter: "remain vigilant against incidents of identity theft and fraud by reviewing account statements for suspicious activity."

65.    To date, critical details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure that such a breach does not occur again have not been explained to Plaintiff Zarate, who retains a vested interest in ensuring that his minor child's PII and/or PHI remains protected.

66.    Moreover, PowerSchool's disclosure of the Data Breach amounts to no real disclosure because it fails to inform, with any degree of specificity, Plaintiff Zarate of the Data Breach's critical facts.

67.    Plaintiff greatly values his privacy, and Plaintiff values the privacy of his minor child. Plaintiff Zarate takes reasonable steps to maintain the

confidentiality of his PII and/or PHI and has never knowingly transmitted unencrypted PII and/or PHI over the internet or any other unsecured source. Plaintiff Zarate stores any and all documents containing PII and/or PHI in a secure location and destroys any documents he receives in the mail that contain his or his minor child's PII and/or PHI or any information that could otherwise be used to compromise his identity and/or credit. Moreover, Plaintiff Zarate diligently chooses unique usernames and passwords for his various online accounts, and he takes steps to ensure his online accounts are secure and password protected.

68.    As a direct and proximate result of the Data Breach, Plaintiff Zarate has spent time—approximately 40 hours—researching the Data Breach; contacting various institutions regarding the Data Breach, including PowerSchool, the California Privacy Protection Agency, the Federal Trade Commission ("FTC"), California Attorney General, United States Department of Education, and Experian; and researching various credit and identity theft monitoring services.

69.    Moreover, Plaintiff Zarate purchased a Norton/LifeLock annual identity protection subscription, at the cost of $155 per year.

70.    Plaintiff Zarate is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud for himself and his minor child, resulting from the Data Breach. The Data Breach has caused Plaintiff Zarate to suffer fear, anxiety, anger, and stress, which have been compounded by PowerSchool's two-month delay in informing him of the fact that his minor child's PII was acquired through the Data Breach.

71.    Plaintiff Zarate anticipates spending considerable time and money on an ongoing basis to try and mitigate and address harms caused by the Data Breach. In addition, Plaintiff Zarate and his minor child will continue to be at present and continued increased risk of identity theft and fraud for years to come.

72.   Plaintiff Zarate has a continuing interest in ensuring that his minor child's PII, which remains in PowerSchool's possession, is protected and safeguarded from future disclosure and/or data breaches.

73.   As a result of the Data Breach, Plaintiff Zarate has already suffered— and is at an increased risk of further suffering—injury and/or damages, including but not limited to, the unauthorized use of his minor child's stolen PII, heightened threat of identity theft and general mitigation efforts spent on monitoring his credit and for identity theft; time and expenses spent scrutinizing bank statements, credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of his minor child's personal data; lost property in the form of his minor child's compromised PII; and injury to his minor child's privacy. Additionally, as a direct result of the Data Breach, Plaintiff Zarate and his minor child now face a substantial risk that unauthorized third parties will further misuse his minor child's PII because (1) the Data Breach involved cybercriminals specifically targeting Defendants' systems; (2) the dataset of Personal Information the cybercriminals exfiltrated from Defendants' systems has already been actually misused for fraudulent and/or unauthorized conduct; and (3) the type of Personal Information the cybercriminals exfiltrated in the Data Breach is highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as fraudulently applying for and obtaining credit cards, loans, mortgages, bank accounts, or other financial accounts in Plaintiff Zarate's minor child's name. As a result of the Data Breach, Plaintiff Zarate and his minor child have (1) suffered, or is at an increased risk of suffering, unauthorized use of his stolen PII such that he has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of his PII and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by his exposure to the risk of future harm

because he lost time that he spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort he expended addressing future consequences of the Data Breach.

74.    Plaintiff Zarate experienced all of the foregoing harm and injury as a direct result of Defendant' actions and inactions that led to the Data Breach. The monetary relief sought herein by Plaintiff Zarate on behalf of his minor child would compensate him for the foregoing redressable injuries. Further, Plaintiff Zarate seeks injunctive relief (including future data breaches or other compromises of his PII that remains in Defendants' possession) to redress the foregoing injuries and harm, including but not limited to requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of his PII accessed by cybercriminals in the Data Breach, as well as enact adequate data privacy/security practices.

## V.    CLASS ACTION ALLEGATIONS

75.    Plaintiff brings this class action on behalf of himself and his minor child, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and where applicable, 23(c)(4), on behalf of the following Nationwide Class and California subclass (collectively, the "Class"):

> **Nationwide Class:** All individuals in the United States whose PII and/or PHI was compromised in the Data Breach ("the Class").

> **California Subclass:** All individuals residing in California whose PII and/or PHI was compromised in the Data Breach ("the California Subclass").

76.    Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the

affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants.

77. **Numerosity**: Class Members are so numerous that their individual joinder is impracticable, as the proposed Class millions of Class Members who are geographically dispersed. The Class Members can be ascertained from information and records in the possession, custody, or control of Defendants and/or its customers.

78. **Typicality**: Plaintiff's claims are typical of Class Members' claims. Plaintiff and all Class Members were injured through Defendants' uniform misconduct, and Plaintiff's claims are identical to the claims of the Class Members he seeks to represent.

79. **Adequacy**: Plaintiff's interests are aligned with the Class that he seeks to represent, and Plaintiff has retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiff and his counsel intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiff and undersigned counsel.

80. **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other Class Members' claims. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class Members individually to effectively redress Defendants' wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By

contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

81.    **Commonality and Predominance**: The following questions common to all Class Members predominate over any potential questions affecting individual Class Members:

        a.  Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII and PHI from unauthorized access and disclosure;

        b.  Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII and PHI;

        c.  Whether Defendants breached their duties to protect Plaintiff's and  Class Members' PII and PHI;

        d.  Whether Defendants violated the statutes alleged herein;

        e.  Whether Plaintiff and all other Class Members are entitled to damages and the measure of such damages and relief.

82.    Given that Defendants engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and common law violations are involved, and common questions outweigh any potential individual questions.

## VI.    CAUSES OF ACTION

### COUNT 1

#### Negligence

(On Behalf of Plaintiff and the Nationwide Class)

83.    Plaintiff realleges and incorporates by reference the foregoing allegations of fact.

84.    Defendants collected, stored, and maintained Plaintiff's and Class Members' PII and PHI.

85.    Defendants owed duties to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their PII and PHI in Defendants' possession, custody, or control, including non-delegable duties to safeguard that PII and PHI. This duty could not be delegated to Defendants' vendors and business associates; rather, Defendants had an independent obligation to control all environments into which it placed consumers' PII and PHI, and to ensure that those environments were used, configured and monitored in such a way as to ensure the safety of consumers' data.

86.    Defendants owed duties to Plaintiff and Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII and PHI within their control from being compromised, lost, stolen, accessed and misused by unauthorized persons.

87.    Defendants owed a duty of care to Plaintiff and Class Members to provide security, consistent with industry standards, to ensure that the systems and networks adequately protected the PII and PHI.

88.    Defendants were in a special relationship with Plaintiff and Class Members because Defendants security measures were intended to benefit Plaintiff and Class Members by making sure that their PII and PHI were secure and protected. But only Defendants could make sure that its systems were secure enough to protect Plaintiff and Class Members' PII and PHI.

89.    Based on the sensitive nature of the PII and PHI that Plaintiff and Class Members provided Defendants, the policy of preventing future harm should thus disfavor the application of the economic loss rule.

90.    Defendants knew the risks of collecting and storing Plaintiff's and all other Class Members' PII and PHI and the importance of maintaining secure

systems—such as secure services, processes and procedures in place to safeguard that PII and PHI. Defendants knew of the many data breaches that have targeted other entities across the United States.

91.    Given the nature of Defendants' businesses, the sensitivity and value of the PII and PHI they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

92.    Defendants breached their duties in numerous ways, including by:

a.    Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiff's and Class Members' PII and PHI;

b.    Failing to comply with industry standard data security standards during the period of the Data Breach;

c.    Failing to comply with regulations protecting the PII and PHI at issue during the period of the Data Breach;

d.    Failing to adequately monitor and audit the data security systems of its customers;

e.    Failing to adequately monitor, evaluate, and ensure the security of its network and systems;

f.    Failing to recognize in a timely manner that Plaintiff's and Class Members' PII and PHI had been compromised; and

g.    Failing to timely and adequately disclose that Plaintiff's and Class Members' PII and PHI had been improperly acquired or accessed.

93.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI by failing to control, design, adopt, implement, control,

direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols to ensure that all software and hardware systems into which it placed consumers' data were protected against the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII and PHI.

94.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

95.    As a result of Defendants' above-described wrongful actions, inactions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injuries and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—a risk that justifies expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; (v) lost value of the unauthorized access to their PII and PHI permitted by Defendants; (vi) the value of long-term credit monitoring and identity theft protection products necessitated by the Data Breach; and/or (vii) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT 2

### Negligence *Per Se*

(On Behalf of Plaintiff and the Nationwide Class)

96.    Plaintiff realleges and incorporates by reference the foregoing allegations of fact.

97.     Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

98.     Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable measures to protect and secure PII and PHI.

99.     Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class Members' PII and PHI and not complying with applicable industry standards, including by failing to control all environments into which it placed consumers' PII and PHI, and to ensure that those environments were used, configured and monitored in such a way as to ensure the safety of consumers' data. Defendants' conduct was particularly unreasonable given the nature and amount of PII and PHI they obtain and store, and the foreseeable consequences of a data breach involving PII and PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class Members.

100.    Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

101.    Plaintiff and Class Members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

102.   The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

103.   It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' PII and PHI to unauthorized individuals.

104.   Under COPPA, 15 U.S.C. § 312.10, Defendants had a "mandate[d]" duty to only "retain children's [PII and PHI] 'for only as long as is reasonably necessary to fulfill the purpose for which the information was collected[,]'" and thereafter had a duty to "delete [children's personal information] using reasonable measures to ensure it's been securely destroyed," even absent a parent's request for the deletion of a child's personal information.

105.   Defendants thus violated COPPA § 312.10 by failing to use reasonable measures to protect Plaintiff and Class Members' PII and PHI, and by not complying with industry standards.

106.   Plaintiff and Class Members are consumers within the class of persons that COPPA is intended to protect.

107.   Defendants' violation of COPPA thus constitutes negligence *per se*.

108.   As a result of Defendants' conduct, the harm that occurred is the type of harm that COPPA is intended to guard against.

109.   The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules, Section 5 of the FTCA, and COPPA. Plaintiff and Class

Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; (v) lost value of the unauthorized access to their PII and PHI permitted by Defendants; (vi) the value of long-term credit monitoring and identity theft protection products necessitated by the Data Breach; and/or (vii) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT 3

### Breach of Implied Contract

(On Behalf of Plaintiff and the Nationwide Class)

110.  Plaintiff realleges and incorporates by reference the foregoing allegations of fact.

111.  Defendants contracted with Plaintiff's and the Class Members' schools and/or school districts for education systems and software. The contracts include Defendants' privacy notices, including the Global Privacy Statement, in which Defendants agreed to safeguard and not disclose to unauthorized persons the PII and PHI that they collected, directly or indirectly.

112.  Implicit in the agreement was that Defendants would adequately safeguard the PII and PHI entrusted to them and would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII and PHI.

1      113.   Plaintiff and Class Members would not have entrusted their PII and

2  PHI to Defendants in the absence of such an agreement.

3      114.   Defendants materially breached the contract(s) they had entered into

4  by failing to safeguard PII and PHI and failing to notify them promptly of the

5  intrusion into their computer systems that compromised such information.

6  Defendants further breached the implied contracts by failing to comply with

7  industry standards and legal obligations that are necessarily within the contracts.

8      115.   The damages that Plaintiff and Class Members sustained were the

9  direct and proximate result of Defendants' material breaches of the implied

10  agreements. Plaintiff and Class Members did not receive the full benefit of the

11  bargain.

12      116.   Plaintiff and Class Members have performed as required under the

13  relevant agreements, or such performance was waived.

14      117.   Plaintiff and Class Members have sustained injury and damages

15  because of Defendants' breaches of their agreements, including, without limitation:

16  unauthorized disclosure of their PII and publication onto the Dark Web; monetary

17  losses; lost time; anxiety, and emotional distress; loss of the opportunity to control

18  how their PII is used; diminution in value of their PII; compromise and continuing

19  publication of their PII; out-of-pocket costs associated with the prevention,

20  detection, recovery, and remediation from identity theft or fraud; lost opportunity

21  costs and lost wages associated with the time and effort expended addressing and

22  attempting to mitigate the actual and future consequences of the Data Breach,

23  including, but not limited to, efforts spent researching how to prevent, detect,

24  contest, and recover from identity theft and fraud; delay in receipt of tax refund

25  monies; unauthorized use of stolen PII; continued risk to their PII, which remains

26  in Defendants' possession and is subject to further breaches so long as Defendants

27

28

fail to undertake the appropriate measures to protect the PII in their possession; increased risk of harm; and lost benefit of the bargain.

## COUNT 4

### Unjust Enrichment

(On Behalf of Plaintiff and the Nationwide Class)

118.   Plaintiff realleges and incorporates by reference the foregoing allegations of fact.

119.   Plaintiff and Class Members have a legal and equitable interest in their PII and PHI that Defendants collected, stored, and maintained—thus conferring a benefit upon Defendants by transmitting that PII and PHI to them or otherwise allowing them to possess it—that were ultimately compromised by the Data Breach.

120.   Defendants accepted or had knowledge of the benefits that Plaintiff and Class Members conferred upon them by, *inter alia*, accepting or otherwise possessing Plaintiff and Class Members' PII and PHI. Defendants also benefitted from the receipt of Plaintiff and Class Members' PII and PHI.

121.   As a result of Defendants' failure to safeguard and protect Plaintiff and Class Members' PII and PHI, they suffered actual damages as a result of the Data Breach. Thus, it would be unjust for Defendants to be permitted to retain the benefit belonging to Plaintiff and Class Members because Defendants failed to adequately implement the data privacy and security procedures that federal, state, and local laws and industry standards mandated.

122.   Defendants should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

123.   Plaintiff and Class Members are entitled to restitution and/or damages from PowerSchool and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct, as well

as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

## COUNT 5

### Declaratory Judgment

### 28 U.S.C. § 2201

(On Behalf of Plaintiff and the Nationwide Class)

124.  Plaintiff realleges and incorporates by reference the foregoing allegations of fact.

125.  An actual controversy has arisen and exists between Plaintiff and Class Members, on the one hand, and Defendants on the other hand, concerning the Data Breach and Defendants' failure to protect Plaintiff and Class Members' PII and PHI, including with respect to the issue of whether Defendants took adequate measures to protect that information. Plaintiff and Class Members are entitled to a judicial determination as to whether Defendants have performed and are adhering to all data privacy obligations as required by law or otherwise to protect Plaintiff and Class Members' PII from unauthorized access, disclosure, and use.

126.  A judicial determination of the rights and responsibilities of the parties regarding Defendants' privacy policies and whether they failed to adequately protect PII and PHI is necessary and appropriate to determine with certainty the rights of Plaintiff and Class Members, and so that there is clarity between the parties as to Defendants' data security obligations with respect to PII and PHI going forward, in view of the ongoing relationships between the parties.

## COUNT 6

### Violation of the California Unfair Competition Law

### Bus. & Prof. Code § 17200 *et seq.* ("UCL")

(On Behalf of Plaintiff and the California Class)

1    127.  Plaintiff realleges and incorporates by reference the foregoing
2  allegations of fact.

3    128.  Defendants are a "person" as defined by Cal. Bus. & Prof. Code
4  § 17201.

5    129.  Cal. Bus. & Prof. Code § 17204 provides that "a person who has
6  suffered injury in fact and has lost money or property as a result of the unfair
7  competition" may file suit.

8    130.  Defendants violated § 17200 *et seq.* by engaging in unlawful, unfair,
9  and deceptive business acts and practices.

10    131.  Defendants' "unfair" acts and practices include:

11    a.  Failure to implement and maintain reasonable security measures to
12      protect Plaintiff and Class Members' PII from unauthorized
13      disclosure, release, data breaches, and theft, which was a direct and
14      proximate cause of the Data Breach, Plaintiff's and Class
15      Members' PII and PHI being compromised, and subsequent harms
16      to Plaintiff and Class Members;

17    b.  Failure to identify foreseeable security risks, remediate identified
18      security risks, and adequately improve security following previous
19      cybersecurity incidents and known coding vulnerabilities in the
20      industry;

21    c.  Failure to implement and maintain reasonable security measures
22      was contrary to legislatively declared public policy that seeks to
23      protect consumers' data; and ensure that the entities that are
24      entrusted with it use appropriate security measures.

25    d.  Failure to implement and maintain reasonable security measures
26      also led to substantial consumer injuries, as described above, that
27      are not outweighed by any countervailing benefits to consumers or

28

competition. Moreover, because consumers could not know of Defendants' inadequate security practices and policies, consumers could not have reasonably avoided the harms that Defendants caused.

132.   Had Defendants disclosed to consumers and the public that they were not complying with industry standards or regulation or that its data systems were not secure and, thus, were vulnerable to attack, Defendants would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law.

133.   Accordingly, Plaintiff and Class Members acted reasonably in relying on Defendants misrepresentations and omissions, the truth of which they could not have discovered.

134.   Defendants were entrusted, either directly or indirectly, with sensitive and valuable PII and PHI regarding millions of consumers, including Plaintiff and the California class. Defendants accepted the critical responsibility of protecting the data but kept the inadequate state of their security controls secret from the public.

135.   As a direct and proximate result of Defendants' unfair, unlawful, and/or fraudulent acts and practices, Plaintiff and California Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including, but not limited to, fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendant's products and services; loss of the value of access to their PII and PHI; and the value of identity and credit protection and repair services made necessary by the Data Breach.

136.    Defendants' violations were, and are, willful, deceptive, unfair, and unconscionable.

137.    Plaintiff and California Class Members have lost money and property as a result of Defendants' conduct in violation of the UCL.

138.    By deceptively, unfairly, and unlawfully storing, collecting, and disclosing their PII and PHI, Defendants have taken money or property from Plaintiff and California Class Members. Defendants acted intentionally, knowingly, and maliciously to violate the UCL, and recklessly disregarded Plaintiff and Class Members' rights.

139.    Defendants should have known that their data security was insufficient to guard against cyberattacks, particularly given the size of their databases and the sensitivity of the PII and PHI therein.

140.    Plaintiff and California Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices or use of their personal information; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief (including future data breaches or other compromises of his PII that remains in Defendants' possession); and other appropriate equitable relief, including public injunctive relief.

## COUNT 7

**Violation of the California Confidential of Medical Information Act**

**Cal. Civ. Code § 56 *et seq.* ("CMIA")**

(On Behalf of Plaintiff and the California Class)

141.    Plaintiff realleges and incorporates by reference the foregoing allegations of fact.

142.    California's Confidentiality of Medical Information Act was enacted to protect, among other things, the release of confidential medical information

without proper authorization. To that end, the CMIA prohibits entities from negligently disclosing or releasing any person's confidential medical information. *See* Cal. Civ. Code § 56.36.

143.  Under Section 56.10(a) of the Civil Code, "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining authorization[.]"

144.  Under section 56.06(b), Defendants are a business that is a "provider of health care." Defendants' business offers software to consumers that collect, store, and maintain medical information to the make information available to an individual or provider or a provider of healthcare, with the purpose of permitting that individual to manage the information, or to treat or manage the individual's medical condition. PowerSchool's customers use the software to support students, which includes those students with medical conditions, disabilities, and special needs.

145.  Plaintiff and Class Members are "enrollees" under section 56.05(e) and are "patients" under section 50.05(m).

146.  At the time of the Data Breach, Plaintiff and Class Members' PII and PHI ("medical information" under section 56.05(j)) was created, maintained, preserved, stored, abandoned, destroyed, or disposed of on or through Defendants' software.

147.  The medical information released included "electronic health records" or "electronic medical records" under section 56.01(c). Unauthorized individuals viewed the medical information when the hackers breached Defendants' computer systems and software, downloaded PII and PHI, and then demanded a ransom.

148.  Thus, Defendants' electronic medical record or electronic health record systems failed to protect the electronic medical information.

149.   Defendants further negligently disclosed and released Plaintiff and Class Members' PII and PHI under section 56.36(b) when they failed to implement adequate security protocols to prevent unauthorized access to Plaintiff and Class Members' PII and PHI, maintain an adequate electronic security system to prevent data breaches, or employ industry standard and commercially available measures to mitigate the risks of any data breach or otherwise comply with industry-standard data security requirements.

150.   As a direct and proximate result of the unauthorized disclosure, Plaintiff and Class Members' have suffered and will continue to suffer economic damages and other injuries and actual harm, including but not limited to the diminution of value of their PII and PHI.

151.   Accordingly, Plaintiff and Class Members seek to recover actual, nominal (including $1,000 nominal damages per disclosure under § 56.36(b)), and statutory damages (including under § 56.36(c)), injunctive relief (including future data breaches or other compromises of his PII that remains in Defendants' possession), where applicable, together with reasonable attorneys' fees, expenses, and costs.

### **COUNT 8**

**Violation of the California Consumer Privacy Act**

**Cal. Civ. Code § 1798.100 *et seq* ("CCPA")**

(On Behalf of Plaintiff and the California Class)

152.   Plaintiff realleges and incorporates by reference the foregoing allegations of fact.

153.   Under section 1798.150(a)(1), "[a]ny consumer whose nonencrypted or nonredacted personal information, as defined by [Civil Code section 1798.81.5(d)(1)(A)] . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and

maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief (including future data breaches or other compromises of his PII that remains in Defendants' possession), and any other relief the court deems proper.

154.    Under section 1798.140(i), Plaintiff is a consumer and California resident.

155.    PowerSchool is a "business under section 1798.140(d)(2). PowerSchool controls entities and shares common branding that are "organized or operated for the profit or financial benefit of its shareholders or other owners, that collect[] consumers' personal information, or on the behalf of which such information is collected and that alone, or jointly with others, determine[] the purposes and means of the processing of consumers' personal information, that do[] business in the state of California."

156.    PowerSchool collected, stored, and maintained Plaintiff and Class Members' PII and PHI in such a format that permitted unauthorized actors to access it.

157.    Under section 1798.140(v)(1), Plaintiff and Class Members' PII and PHI was subject to disclosure, theft, and unauthorized access as a result of the Data Breach. The Data Breach exposed PII and PHI, including, but not limited to, name, Social Security numbers, dates of birth, addresses, phone numbers, emails, photo identification, tax information numbers, health histories, and other medical information.

158.    The Data Breach occurred as a direct and proximate result of Defendants' failure to maintain and implement reasonable security procedures, practices, and systems for protecting the exposed, highly sensitive PII and PHI. Defendants' failure to monitor and maintain its systems to identify and account for

1  any suspicious activity thus permitted unauthorized actors to access Plaintiff's and

2  Class Members' PII and PHI.

3      159.  Pursuant to section 1798.150(b), Plaintiff provided written notice to

4  Defendants on April 22, 2025, specifying the provisions that Defendants violated,

5  and stated that Defendants have 30 days to cure those violations.[54] If Defendants

6  fail to cure its violations within the 30-day notice period, Plaintiff will amend (or

7  seek leave to amend) the complaint to add claims for monetary relief, including

8  restitution, actual, and punitive damages under the CCPA. At this time, Plaintiff

9  seeks injunctive and declaratory relief (including future data breaches or other

10  compromises of his PII that remains in Defendants' possession), and any other relief

11  deemed appropriate by the Court. Plaintiff, at this time, does not seek statutory

12  damages but reserves the right to seek statutory damages in the future.

## COUNT 9

### Violation of the California Consumer Privacy Act

### Cal. Const., Art. I, § 1

(On Behalf of Plaintiff and the California Class)

17      160.  Plaintiff realleges and incorporates by reference the foregoing

18  allegations of fact.

19      161.  Art. I, § 1 of the California Constitution provides: "All people are by

20  nature free and independent and have inalienable rights. Among these are enjoying

21  and defending life and liberty, acquiring, possessing, and protecting property, and

22  pursuing and obtaining safety, happiness, and privacy." Art. I, § 1, Cal. Const.

23      162.  The right to privacy in California's Constitution creates a private right

24  of action against private and government entities.

---

[54] Plaintiff provided notice by overnight delivery, signature required, dated April 22, 2025.

163.  To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

164.  Defendants violated Plaintiff's and California Class Members' constitutional right to privacy by collecting, storing, and disclosing, or preventing from unauthorized disclosure, their personal identifying information and protected health information, which includes their legally protected privacy interest, and for which they had a reasonable expectation of privacy. Disclosure of their PII and PHI was highly offensive given the highly sensitive nature of the data. Disclosure of their private medical information in particular could cause humiliation to Plaintiff and Class Members. Accordingly, disclosure of Plaintiff's and Class Members' PII and PHI is an egregious violation of social norms.

165.  Defendants intruded upon Plaintiff's and California Class Members' legally protected privacy interests, including interests in precluding the dissemination or misuse of their confidential PII and PHI.

166.  Plaintiff's and California Class Members had a reasonable expectation of privacy in that: (i) their invasion of privacy occurred as a result of Defendants lax and inadequate security practices with respect to securely collecting, storing, and using data, as well as preventing the unauthorized disclosure of their Private Information; (ii) Plaintiff and California Class Members did not consent or otherwise authorize Defendants to disclose their PII and PHI to parties responsible for the cyberattack; and (iii) Plaintiff and California Class Members could not reasonably expect Defendants would commit acts in violation of laws protecting their privacy.

167. Moreover, Defendants (i) knew that their information security practices were inadequate and had numerous security vulnerabilities; (2) intentionally, willfully, recklessly, or negligently failed to take adequate and reasonable measures to ensure that their data systems were protected; (iii) knew that their inadequate data security measures would likely result in a breach; and (iv) knew that such a breach would harm Plaintiff.

168. As a result of Defendants' actions, Plaintiff and California Class Members have been damages as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation.

169. Plaintiff and California Class Members suffered actual and concrete injury as a result of Defendants' violations of their privacy interests. Plaintiff and California Class Members are entitled to appropriate relief, including damages to compensate them for the harms to their privacy interests, loss of valuable rights and protections, heightened stress, fear, anxiety, and risk of future invasions of privacy, and the mental and emotional distress and harm to human dignity interests caused by Defendants' invasions.

170. Plaintiff and California Class Members seek appropriate relief for that injury, including, but not limited to, damages that will reasonably compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiff's and California Class Members' privacy.

## VII.   PRAYER FOR RELIEF

Wherefore Plaintiff, on behalf of his minor child and all others similarly situated, prays for relief as follows:

A. Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as Class Representative and undersigned counsel as Class Counsel;

B.      Award Plaintiff and the Class actual and statutory damages, punitive damages, nominal damages, and monetary damages to the maximum extent allowable;

C.      Award declaratory and injunctive relief (including future data breaches or other compromises of his PII that remains in Defendants' possession) as permitted by law or equity to assure that Class Members have an effective remedy, including enjoining Defendants from continuing the unlawful practices as set forth above;

D.      Award Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Award Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Award Plaintiff and the Class such other relief as allowable under law or at equity.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: April 22, 2025                    Respectfully submitted,


                                         */s/ Sophia M. Rios*
                                         Sophia M. Rios, SBN 305801
                                         BERGER MONTAGUE PC

                                         *Attorneys for Plaintiff*